# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| Todd D. Auge, | Case No. 17-cv-5365 (WMW/ECW) |
| Plaintiff, | |
| v. | **ORDER ON CROSS MOTIONS FOR SUMMARY JUDGMENT** |
| Fairchild Equipment, Inc., | |
| Defendant. | |

In this lawsuit alleging breach of an employment contract and failure to pay wages, Plaintiff Todd D. Auge and Defendant Fairchild Equipment, Inc. (Fairchild), cross-move for summary judgment. (Dkts. 40, 46.) For the reasons addressed below, Fairchild's motion is granted and Auge's motion is denied.

## BACKGROUND

Fairchild, a Wisconsin corporation that operates material-handling equipment dealerships, hired Auge as a "field sales manager" for industrial cleaning equipment at its Burnsville, Minnesota, dealership in April 2013. At the start of his employment, Auge received a written commission plan from Fairchild titled "2013 Pay Program," which Auge signed on April 22, 2013. The purpose of the 2013 Pay Program was "to outline the commission and compensation arrangements" between Auge and Fairchild "for as long as [Auge] remains a salesperson of Fairchild Equipment." Among other things, the 2013 Pay Program addresses vacation time and certain business expenses that Fairchild would

reimburse.  As relevant here, the 2013 Pay Program also provides that Auge would receive

commissions as follows:

> ➢ Sale of New Equipment to be paid at 30% of gross profit.
> ➢ Sale of Used Equipment to be paid at 6% of sell price.
>
> . . .
>
> ➢ Sale of short term rental will be paid at 6% of the monthly billing of all rentals directly sold by the sales person.
>
> . . .
>
> ➢ Aftermarket commissions will be paid on the Rental, Parts and Service volume at the rate of 3% of the monthly revenue on any new customer for the Calendar year of 2013.  The commission rate will drop to 1% on the years after the initial year.
> ➢ Sale of JCB products with full involvement 10% of the [gross profit]
> ➢ Sale of JCB products with Partial involvement 5% of the [gross profit]
> ➢ Sale of JCB products resulting from a lead you generate $100.00

The 2013 Pay Program does not define when a "sale" occurs.

Auge received training in or about August 2016 pertaining to the sale of JCB

products.  Auge contends that he became an authorized JCB sales representative for

Fairchild at that time and that his manager orally promised Auge that he would be paid a

30% commission on Fairchild's gross profit from all JCB products that Auge sold.

Fairchild and Auge's manager dispute these assertions.

Several months later, Auge prepared a document titled "JCB Order Form," dated

February 14, 2017, that pertains to JCB equipment ordered by a Fairchild customer, Birds

Eye Foods, for $2,038,500.  The JCB Order Form states that the equipment would be

invoiced to the customer on April 28, 2017, and shipped to the customer on May 26, 2017.

Under the terms of the transaction, a third party, JCB Finance, purchased the equipment

from Fairchild. JCB Finance, in turn, would lease the equipment to Bird Eye Foods for three years. At the end of the lease term, Birds Eye Foods would have the option to purchase the equipment for $1,350,720. As part of this transaction, Fairchild agreed that if Birds Eye Foods does *not* purchase the equipment at the end of the lease, JCB Finance can sell the equipment to another third party. Under the agreement, if JCB Finance sells the equipment for less than $1,350,720, Fairchild will pay JCB Finance the difference up to $115,503.66 (the Residual Hold). Fairchild told Auge in May 2017 that, although Fairchild would not immediately recognize as profit the Residual Hold amount and an additional "warranty exposure" amount of approximately $41,000 (the Warranty Reserve), Auge would be eligible for commission on the Residual Hold and Warranty Reserve amounts in three years when Fairchild recognizes this portion of the profit. After these terms of the transaction were finalized, the equipment was shipped to Birds Eye Foods in June 2017.

Meanwhile, in or about March 2017, Auge received a new written commission plan from Fairchild titled "2017 Pay Program," which Auge signed on March 28, 2017. The 2017 Pay Program commenced on April 1, 2017, and provides, in relevant part, that Auge would receive "25% of the gross profit on JCB new equipment sold through December 31st, 2017," and that Auge would receive a commission on a rental purchase option (RPO) agreement only in the event that the agreement results in an equipment sale. Under the 2017 Pay Program, "[c]ommissions are considered earned in the month that equipment is actually shipped to customer site and signed off as received by customer." And the 2017

Pay Program, like the 2013 Pay Program, also delineates vacation time and certain business expenses that Fairchild would reimburse.

Auge resigned from his employment on July 5, 2017, by sending an email to his supervisor with the subject line "I quit, 7.5.17 Todd Auge" and nothing in the body of the email. That same day, Auge parked his company truck at Fairchild's Burnsville dealership and locked the keys and a resignation letter inside. Approximately three weeks later, Fairchild direct deposited into Auge's bank account a commission payment of $30,908.13, which included a 25% commission payment for the JCB equipment transaction involving Birds Eye Foods. This payment included a commission on the Residual Hold and Warranty Reserve amounts, contrary to what Fairchild had told Auge would occur. Shortly thereafter, Auge's former manager called Auge and advised him that the direct deposit had been miscalculated and would be corrected. Fairchild reversed the $30,908.13 direct deposit the next day and reissued a commission payment of $14,134.16 based on a corrected gross profit amount that excludes the Residual Hold and Warranty Reserve amounts.

Auge commenced this lawsuit against Fairchild in Minnesota state court on November 16, 2017. Fairchild removed the case to this Court shortly thereafter. Count I of the complaint alleges breach of contract. Count II alleges failure to pay wages, a violation of the Minnesota Payment of Wages Act, Minn. Stat. §§ 181.03, 181.14. In support of these claims, Auge alleges that, because Fairchild owed him a 30% commission on the full amount of the JCB equipment transaction with Birds Eye Foods, Fairchild underpaid him for this transaction by $58,900.06. Auge also alleges that Fairchild failed

to pay him commissions on 10 other equipment transactions, including five RPO transactions, as well as commissions on parts and service sales. And Auge seeks compensation for his unused vacation time that had accrued on the date of his resignation and unreimbursed business expenses of $400. Auge also seeks penalties, attorneys' fees, and costs pursuant to the Minnesota Payment of Wages Act. *See* Minn. Stat. § 181.171, subd. 3.

## ANALYSIS

Auge and Fairchild cross-move for summary judgment on both counts of Auge's complaint. Summary judgment is proper when, viewing the evidence in the light most favorable to the nonmoving party and drawing all reasonable inferences in that party's favor, there is "no genuine dispute as to any material fact" and the moving party is "entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Windstream Corp. v. Da Gragnano*, 757 F.3d 798, 802-03 (8th Cir. 2014). A genuine dispute as to a material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). To defeat a motion for summary judgment, the opposing party must cite with particularity those aspects of the record that support any assertion that a fact is genuinely disputed. Fed. R. Civ. P. 56(c)(1)(A); *accord Krenik v. Cty. of Le Sueur*, 47 F.3d 953, 957 (8th Cir. 1995). The Court addresses in turn each count of Auge's complaint.

### I.     Breach of Contract (Count I)

Both parties contend that they are entitled to summary judgment on Auge's breach-of-contract claim. It is undisputed that Minnesota law governs this claim. The elements

of a breach-of-contract claim under Minnesota law are "(1) formation of a contract, (2) performance by plaintiff of any conditions precedent to the right to demand performance by the defendant, and (3) breach of the contract by defendant." *Toomey v. Dahl*, 63 F. Supp. 3d 982, 997-98 (D. Minn. 2014) (quoting *Park Nicollet Clinic v. Hamann*, 808 N.W.2d 828, 833 (Minn. 2011)). To recover, the party alleging breach also must have suffered damages as a result of the breach. *See Gen. Mills Operations, LLC v. Five Star Custom Foods, Ltd.*, 703 F.3d 1104, 1107 (8th Cir. 2013) (applying Minnesota law). When reviewing contractual language, Minnesota courts seek to determine the intent of the parties. *Caldas v. Affordable Granite & Stone, Inc.*, 820 N.W.2d 826, 832 (Minn. 2012).

Auge alleges that Fairchild breached the 2013 Pay Program and the 2017 Pay Program by failing to pay him the correct commission amounts for the JCB equipment transaction with Birds Eye Foods and several other transactions that occurred in 2016 and 2017, as well as payments for unused accrued vacation time and business expense reimbursements. For the pending motions for summary judgment, Fairchild assumes without conceding that the 2013 Pay Program and the 2017 Pay Program are valid and enforceable contracts, not simply employment policies. But Fairchild argues that it has breached neither the 2013 Pay Program nor the 2017 Pay Program. The Court addresses in turn each alleged breach.

### A. Commission on JCB Equipment Transaction with Birds Eye Foods

Auge contends that he is entitled to receive a 30% commission on Fairchild's gross profit with respect to the JCB equipment transaction with Birds Eye Foods. According to

Ague, Fairchild committed two breaches with respect to this commission payment: first, by paying him a commission of 25% instead of 30%, and second, by excluding the Residual Hold amount of $115,503 and the Warranty Reserve amount of $41,000 from its calculation of gross profit on this transaction.

### 1. Applicable Commission Rate

Auge first argues that Fairchild owed him a 30% commission on the JCB equipment transaction with Birds Eye Foods. Fairchild contends that the 25% commission it paid Auge for this transaction was correct.

It is undisputed that Auge prepared an order form and related paperwork for this transaction in February 2017. It also is undisputed that the JCB equipment was not invoiced or shipped to Birds Eye Foods until June 2017. In the interim, the 2017 Pay Program took effect on April 1, 2017, replacing the 2013 Pay Program. The 2017 Pay Program provides for a 25% commission on the sale of JCB equipment, including a specific reference to the JCB equipment transaction with Birds Eye Foods.[1] The Court must determine whether the commission Auge earned on the JCB equipment transaction with Birds Eye Foods is governed by the 2013 Pay Program or the 2017 Pay Program.

Auge contends that the Birds Eye Foods transaction is governed by the 2013 Pay Program. Although the 2017 Pay Program states that "[c]ommissions are considered earned in the month that equipment is actually shipped to customer site and signed off as

---

[1] The 2017 Pay Program refers to this as the "Pinnacle Foods FastTrack commission." The record demonstrates that this is a reference to Auge's JCB equipment transaction with Birds Eye Foods.

received by customer," the 2013 Pay Program does not address *when* a commission is earned. A written contract that does not purport to include all the terms of the agreement, or that is facially incomplete upon mere inspection, "may be enlarged by parol or extrinsic evidence to show the entire agreement." *Bunker v. Meshbesher*, 147 F.3d 691, 697 (8th Cir. 1998) (quoting *Lentz v. Pearson*, 74 N.W.2d 662, 666 (Minn. 1956)). When the extrinsic evidence is "conclusive and undisputed," the meaning of the contract may be determined by the district court as a matter of law. *Guercio v. Prod. Automation Corp.*, 664 N.W.2d 379, 385 (Minn. Ct. App. 2003) (internal quotation marks omitted); *accord Transp. Indem. Co. v. Dahlen Transp. Inc.*, 161 N.W.2d 546, 550 (Minn. 1968).

Fairchild contends that, even before the 2017 Pay Program took effect, sales employees did not earn a commission on a sale until the equipment was invoiced and shipped to the customer. In support of this position, Fairchild relies on the declaration of Auge's former manager, who asserts:

> Commissions were not earned at the time the sale was booked. Depending on the nature of the equipment and/or the financing terms, it may actually take several months for a customer to receive the equipment and thus the sales employee would not earn the commission for several months. After the equipment was delivered to the customer, Fairchild would determine the gross profit on the sale and pay out the applicable commission to the sales employee on the second paycheck in the following month. . . . Fairchild followed the foregoing procedures with respect to the commissions earned by Mr. Auge during the term of his employment, both under the 2013 Pay Program and the 2017 Pay Program.

Fairchild's CEO, in his declaration, similarly describes the method by which sales employees earned commissions. Fairchild maintains that these facts are not genuinely in dispute because, in his deposition testimony, Ague repeatedly agreed that, throughout his

employment, Fairchild paid commissions only *after* a sale was invoiced and the equipment was shipped to the customer.

In support of his contrary position, Auge relies on his declaration, which states that "[o]n February 14, 2017, I successfully completed the $2,038,500 sale of new JCB equipment to Birds Eye Foods," along with three exhibits. The first exhibit is a February 15, 2017 email to him in which his manager wrote, "Very nice job developing this sales opportunity and persevering to the successful conclusion!" The second exhibit is an April 10, 2017 email from Auge's manager announcing Auge's promotion to a "Construction Equipment Sales Representative," which mentions Ague's "record-setting JCB [equipment] sales" to Birds Eye Foods. The third exhibit is a compilation of emails and business records from February 2017 that pertain to the Birds Eye Foods transaction, including the February 14, 2017 JCB Order Form.

"A party cannot offer testimony that contradicts the party's earlier statements made under oath to create a genuine issue of material fact." *Progressive N. Ins. Co. v. McDonough*, 608 F.3d 388, 391 (8th Cir. 2010). Auge's declaration is inconsistent with his prior unequivocal deposition testimony that Fairchild paid commissions only after a transaction was invoiced and the equipment was shipped to the customer. For this reason, Auge's declaration cannot create a genuine issue of material fact as to whether he earned a commission on the JCB equipment transaction with Birds Eye Foods in February 2017. And the emails from Auge's manager congratulating Auge for this transaction fall short because no reasonable jury could interpret those emails as evidence of the manager's intent to alter Fairchild's policy as to when sales employees earned a commission on a given

transaction. Moreover, Auge relies on the JCB Order Form, which shows that the equipment would not be invoiced and shipped until several months later. On this record, there is no *genuine* dispute of material fact that Auge earned a commission on the JCB equipment transaction with Birds Eye Foods in June 2017, after the 2017 Pay Program had taken effect.

Because the 2017 Pay Program governed the commission Auge earned on the JCB equipment transaction with Birds Eye Foods, Fairchild did not breach the 2017 Pay Program by paying Auge a 25% commission on that transaction.

### 2. Calculation of Gross Profit

Auge also argues that Fairchild underpaid his commission by incorrectly calculating Fairchild's gross profit on the Birds Eye Foods transaction. According to Auge, Fairchild had no authority to exclude the Residual Hold amount of $115,503 and the Warranty Reserve amount of $41,000 from Fairchild's calculation of gross profit on this transaction. Fairchild counters that its calculation of gross profit as to this transaction is in accordance with the 2017 Pay Program.

"In Minnesota, the compensation of an at-will employee may be adjusted by the employer at any time during employment without the employee's consent." *Beatty v. N. Cent. Cos.*, 170 F. Supp. 2d 868, 876 (D. Minn. 2001) (citing *Pershern v. Fiatallis N. Am., Inc.*, 834 F.2d 136, 138 (8th Cir. 1987)); *see also Aberman v. Malden Mills Indus., Inc.*, 414 N.W.2d 769, 772 (Minn. Ct. App. 1987) (explaining that an at-will employee is not entitled to a specific commission rate). It logically follows that an employer need not obtain an at-will employee's consent to adjust the method by which it calculates the gross

profit on a transaction that is subject to a commission payment.[2] Here, the 2017 Pay Program expressly provides that Ague is an at-will employee, and Auge cites no facts to the contrary. The 2017 Pay Program does not require Fairchild to use a particular method when calculating its gross profit or to obtain Auge's consent before modifying that method. In short, Auge cites no legal or factual basis to require Fairchild to obtain Auge's consent or otherwise limit Fairchild's authority to adjust its method of calculating gross profit.

Auge suggests that Fairchild's exclusion of the Residual Hold and Warranty Reserve amounts from its gross profit calculation is contrary to the 2017 Pay Program. But the 2017 Pay Program specifically addresses the commission Auge would earn on the JCB equipment transaction with Birds Eye Foods:

- o 25% of gross profit money ($) booked in 2017. Remainder of un-booked gross profit will be re-examined annually.
- o 25% commission to be paid on booked gross profit in subsequent years until all of the gross profit for the original [JCB equipment] deals are booked.

These provisions of the 2017 Pay Program are consistent with Fairchild's email communications with Auge in May and June 2017. In those emails, Fairchild repeatedly advised Auge that the Residual Hold and Warranty Reserve amounts would not be recognized by Fairchild as profit until the end of the 3-year lease term and that Auge would be eligible to earn a commission on this portion of the profit at that time. Moreover, this evidence is consistent with how Fairchild ultimately paid Auge in July 2017 after revising the direct deposit.

---

[2] Indeed, the 2017 Pay Program states that Fairchild, "in its sole discretion, may amend this commission pay program at any time, for any reason."

Because there is no genuine dispute of material fact as to this issue, the Court concludes that Fairchild did not breach the 2017 Pay Program with respect to the commission it paid Auge for the JCB equipment transaction with Birds Eye Foods.

## B.        Commissions on RPO Transactions

Auge also contends that Fairchild owes him commissions for five RPO transactions. Fairchild argues that, with respect to four of these RPO transactions, Auge was not an employee of Fairchild when the customer purchased the equipment and, therefore, Auge did not earn a commission on those sales.  And, according to Fairchild, the fifth RPO transaction did not result in a profit.  The parties rely on the language of the 2013 Pay Program and the 2017 Pay Program to support their positions.

The goal of contract interpretation is to determine the intent of the parties.  *Caldas*, 820 N.W.2d at 832.   The interpretation of an unambiguous contract, as well as the determination whether a contract is ambiguous, present questions of law for the district court.  *Staffing Specifix, Inc. v. TempWorks Mgmt. Servs., Inc.*, 913 N.W.2d 687, 692 (Minn. 2018).  "The terms of a contract are ambiguous if they are susceptible to more than one reasonable interpretation."  *Id.*

The 2017 Pay Program provides that Auge is entitled to a commission that is a percentage of Fairchild's gross profit on certain transactions.  With respect to RPO transactions, "[i]f [the RPO] results in [an] equipment sale, a sales commission is paid at [that] point."  This unambiguous language requires an RPO transaction to result in an equipment sale before Auge earns any commission on the transaction.

In 2016 and 2017, Auge booked the five RPO transactions at issue here. Each RPO provides the customer an *option* to purchase the equipment at the end of the rental term, but four of the five RPO transactions did not result in a sale before Auge resigned. At most, Auge had an *expectation* of earning a commission on these four RPO transactions. But this expectation existed only as long as Auge was employed by Fairchild. *See Karlen v. Jones Lang LaSalle Ams., Inc.*, 766 F.3d 863, 868-69 (8th Cir. 2014) (reaching same conclusion in similar circumstances). A fifth RPO transaction *did* result in a sale before Auge resigned. But because Auge's commission payments were based on a percentage of Fairchild's gross profit and Fairchild lost money on that sale, Fairchild did not pay Auge a commission on that sale. For these reasons, under the 2017 Pay Program, Auge is not entitled to commissions on these five RPO transactions.

Auge does not dispute any of the foregoing facts. Rather, he argues that these RPO transactions are governed by the 2013 Pay Program, which does not expressly require an RPO transaction to result in a sale before a commission is earned. Auge is correct that four of the five disputed RPO transactions were *booked* before the 2017 Pay Program took effect. Because these RPO transactions did not result in a *sale* before Auge resigned, Auge did not earn commissions on these RPO transactions under the terms of the 2017 Pay Program. But even assuming that the 2013 Pay Program applies to these RPO transactions, Auge's arguments fare no better.

The 2013 Pay Program provides that the "[s]ale of [a] short term rental will be paid at 6% of the monthly billing of all rentals directly sold by the sales person." One reasonable interpretation of this language is that a sales employee earns commission on equipment

rentals during each billing month of the rental term. But the terms "sell" and "rent" typically are not used interchangeably in ordinary usage. Homeowners, for example, would not characterize the purchase of their home as a "rental," nor would a landlord typically characterize the renting of an apartment as the apartment having been "sold" to a tenant. Thus, a second reasonable interpretation of the language in the 2013 Pay Program is that a sales employee earns a commission on equipment rentals only if the rented equipment is later "sold" to the customer. Because it is susceptible to at least two reasonable interpretations, this language in the 2013 Pay Program is ambiguous.

When a district court concludes that a contract is ambiguous, the court "may admit parol, or extrinsic, evidence of the parties' intent." *Staffing Specifix*, 913 N.W.2d at 692. The interpretation of ambiguous contract terms using extrinsic evidence ordinarily is a question of fact for a jury. *Id.* But when the extrinsic evidence is both conclusive and undisputed, the contract's meaning may be determined by the district court as a matter of law. *Guercio*, 664 N.W.2d at 385; *accord Transp. Indem. Co.*, 161 N.W.2d at 550.

Fairchild's CEO both testified at his deposition and asserts in his declaration that Fairchild does not pay commissions to sales employees on RPO transactions until the customer purchases the equipment, which typically occurs at the end of the RPO rental term. This is because Fairchild does not recognize a profit on the transaction until the purchase option is exercised, if that option is exercised at all. This manner of paying commissions on RPO transactions is consistent with the express terms of the 2017 Pay Program.

In his deposition testimony, Auge did not dispute that Fairchild pays commissions on RPO transactions in this manner and had done so during Auge's entire term of employment. Instead, Auge testified that he does not *agree* with Fairchild's practice of paying commissions on RPO transactions in this manner. But Auge's disagreement with Fairchild's policies and practices does not create a genuine dispute of material fact as to whether he is entitled to commissions that he had not earned at the time of his resignation. Significantly, Auge cites no evidence refuting Fairchild's evidence as to its practice of paying commissions on RPO transactions. The undisputed evidence conclusively supports only one reasonable interpretation of the ambiguous language in the 2013 Pay Program— that is, a sales employee earns a commission on an equipment rental only if the rented equipment is later "sold" to the customer. Auge did not earn commissions on the disputed RPO transactions under either the 2017 Pay Program or the 2013 Pay Program.

Auge contends that Minnesota law requires Fairchild to pay him commissions on these RPO transactions because he performed work on the RPO transactions before he resigned. In support of this argument, Ague relies on *Rosenberg v. Heritage Renovations, LLC*, 685 N.W.2d 320 (Minn. 2004) and *Lundeen v. Cozy Cab Mfg. Co.*, 179 N.W.2d 73 (Minn. 1970). Auge's reliance on these cases is misplaced. In *Rosenberg*, the Minnesota Supreme Court reversed the trial court's grant of summary judgment in light of the "procuring cause" doctrine. 685 N.W.2d at 327-30. But the procuring cause doctrine applies only when the *employer* prevents the employee from performing a condition precedent to earning a commission. *See id.* at 327. It is undisputed that Ague resigned. Auge—not his employer, Fairchild—prevented Auge from fulfilling the conditions

precedent to his earning commissions on these RPO transactions. The "procuring cause" doctrine is inapplicable here.

In *Lundeen*, the plaintiff's contract with his former employer entitled him "to commissions on all sales made to established dealers if [the plaintiff] visited the dealer within 120 days prior to [the] date of sale," and the contract did "not require that plaintiff do anything else to earn his commission." 179 N.W.2d at 75. Here, by contrast, both the 2013 Pay Program and the 2017 Pay Program require an intervening event to occur, namely, an RPO customer must purchase the rented equipment before Auge earns a commission. No such purchase had occurred when Auge resigned. Therefore, *Lundeen* is inapposite.

For these reasons, Fairchild did not breach the 2013 Pay Program or the 2017 Pay Program when it did not pay Auge commissions on the five disputed RPO transactions.

### C.     Commissions on Miscellaneous Other Transactions

Auge's complaint alleges that Fairchild breached its contractual obligations by failing to pay him commissions on five additional transactions that occurred in 2016 and 2017.

Fairchild does not dispute that, during Auge's employment, Fairchild failed to pay Auge commissions of $133.62, $304.05, and $54 for equipment transactions dated October 19, 2016, October 25, 2016, and January 1, 2017, respectively. Approximately one month after receiving a demand letter from Auge pertaining to these transactions, Fairchild sent Auge a check that included these amounts. But Auge refused to accept it. Auge's refusal to accept Fairchild's tendered payment does not establish a breach of contract. *See, e.g.*,

*Servais v. T.J. Mgmt. of Minneapolis, Inc.*, 973 F. Supp. 885, 895 (D. Minn. 1997) (granting defendant's motion for summary judgment as to plaintiff's breach-of-contract claim when plaintiff refused to accept payment tendered from defendant). Thus, Auge's claims fail as to these transactions.

Auge also contends that Fairchild owes him $819 in unpaid commission for a December 20, 2016 equipment rental transaction. Under the 2013 Pay Program, Auge earned a 1% commission on equipment rentals each month beginning in 2014. Fairchild does not dispute that this rental lasted 6 months at a monthly rate of $1,950. Auge presents no evidence that this rental extended beyond 6 months. Thus, the undisputed record reflects that Fairchild owed Auge $117 in commission for this transaction. After receiving Auge's demand letter, Fairchild sent Auge a check that included this amount. But Auge refused to accept it. Auge cannot establish a breach of contract with respect to this transaction.

Auge also alleges that Fairchild owes him $225 in unpaid commission for a May 30, 2017 equipment rental transaction. Fairchild disputes any obligation to pay Auge any commission for this transaction because Auge was not entitled to a commission on rental transactions under the 2017 Pay Program. Indeed, the 2017 Pay Program provides that no commissions will be earned on rentals "except for Big Truck . . . or rental purchase option agreements." Auge presents no argument or evidence as to this transaction. Therefore, Auge has not established a breach of contract with respect to it.

Because there is no genuine dispute of material fact as to any of these transactions, Fairchild is entitled to summary judgment that it did not breach the 2013 Pay Program or the 2017 Pay Program with respect to these transactions.

### D.  Commissions on Parts and Service Sales

Auge seeks $1,000.21 from Fairchild as compensation for parts and service commissions that he contends he earned under the 2013 Pay Program between late 2016 and April 1, 2017.

Under the 2013 Pay Program, Auge would receive 1% commissions on parts and service sales beginning in 2014.  But, as addressed above, Minnesota law permits "the compensation of an at-will employee [to] be adjusted by the employer at any time during employment without the employee's consent."  *Beatty*, 170 F. Supp. 2d at 876 (citing *Pershern*, 834 F.2d at 138).  And the 2013 Pay Program expressly provides that Auge is an at-will employee.

Fairchild concedes that it stopped paying Auge commissions on parts and service sales in late 2016.  According to the declaration of Auge's former manager, Isaac Yates, Fairchild "made significant changes to its aftermarket sales program, which included parts and service sales" in 2016.  Yates asserts that he communicated the anticipated changes to all Minnesota sales employees of Fairchild, including Auge.  The record includes a May 5, 2016 email that Yates sent to Fairchild's Minnesota sales employees, which describes these changes.  Yates maintains that all of Fairchild's Minnesota sales employees, including Auge, were advised that they would no longer be paid commissions on parts and service sales.  Auge does not dispute that these changes occurred.  Nor does he present any

evidence or argument to refute these facts. As the undisputed record demonstrates that Auge was not entitled to earn commissions on parts and service sales after fall 2016, Auge fails to establish a breach of contract with respect to these transactions.

Accordingly, Fairchild did not breach the 2013 Pay Program with respect to the disputed parts and service commission payments.

### E.     Business Expense Reimbursement and Unused Vacation Time

Auge claims that Fairchild owes him a business expense reimbursement of $400 and $2,883.60 for unused accrued vacation time.

### 1.     Business Expense Reimbursement

With respect to the $400 business expense reimbursement, the 2017 Pay Program required Auge to submit an expense report before he would be paid a business expense reimbursement. Auge does not dispute that he did not submit an expense report for this amount. It also is undisputed that Fairchild nonetheless sent Auge a check that included this $400 reimbursement, but Auge refused to accept it. Auge cannot establish a breach of contract on these undisputed facts.

### 2.     Unused Accrued Vacation Time

Auge also seeks $2,883.60 for unused accrued vacation time. Fairchild maintains that Auge violated the terms of its employee handbook by failing to give two weeks' notice before he resigned and, for this reason, Auge is not entitled to payment for his unused vacation time.

"Minnesota law does not provide for employee vacation time or pay as of right; rather, the law permits employers to choose whether to grant employees vacation benefits."

*Lee v. Fresenius Med. Care, Inc.*, 741 N.W.2d 117, 126 (Minn. 2007). As such, an employer and employee can contract for the circumstances under which the employee is entitled to receive paid time off and payment in lieu of such paid time off. *Id.* at 123. Because Minnesota law does not provide for vacation pay as of right, an employer's "liability as to vacation-pay rights is wholly contractual." *Id.* at 126 (internal quotation marks omitted). To recover damages for allegedly accrued vacation time, Auge must establish that Fairchild breached a contractual obligation to pay him for unused accrued vacation time when Auge resigned.

An employee handbook may constitute terms of an employment contract in some circumstances, but a "disclaimer in an employment handbook that clearly expresses an employer's intent will prevent the formation of a contractual right." *Roberts v. Brunswick Corp.*, 783 N.W.2d 226, 230-32 (Minn. Ct. App. 2010) (concluding that the disclaimer "[n]othing in this employee handbook should be construed as a contract" prevented the formation of a contract). Fairchild is correct in asserting that, according to its employee handbook, "[e]mployees who fail to give a two-week notice . . . will not be paid for any unused earned vacation or personal time." And Auge received a copy of this handbook in 2014, when he signed an acknowledgment that he had received it and would abide by it. But Fairchild's handbook also states that it "is not, nor is it intended to constitute, an employment contract of any kind." Under Minnesota law, this clear disclaimer prevents the formation of a contract. *See id.* at 232. As the handbook is not a contract, there can be no breach—by *either* party—of the handbook's terms.

The 2017 Pay Program, which was in effect when Auge resigned, states that Auge "will be *eligible for* One Hundred Twenty (120) hours of vacation time in 2017." (Emphasis added.) Assuming, without deciding, that the 2017 Pay Program is an enforceable contract, which Fairchild concedes for the purpose of the pending motions for summary judgment, the 2017 Pay Program does not address Fairchild paying Auge for unused accrued vacation time. Nor does it state that Auge necessarily will accrue vacation time in 2017. Instead, it states that Auge is *eligible for* 120 hours of vacation time in 2017. Because nothing in the record establishes that Fairchild had a contractual obligation to pay Auge for unused accrued vacation time, Auge fails to establish a breach of contract on this basis.

In summary, there is no genuine dispute of material fact with respect to the payment of commissions, business expense reimbursements, or unused accrued vacation time that could establish a breach of contract by Fairchild. Accordingly, Auge's motion for summary judgment as to Count I of the complaint is denied and Fairchild's motion for summary judgment as to Count I of the complaint is granted.

## II.     Minnesota Payment of Wages Act (Count II)

Auge contends that Fairchild violated the Minnesota Payment of Wages Act in two ways: first, by failing to pay commissions to Auge both before and after his resignation, in violation of Minn. Stat. § 181.14; and second, by altering the method, timing, or procedures for the payment of commissions after his employment ended, in violation of Minn. Stat. § 181.03. The Court addresses each alleged violation in turn.

## A.     Section 181.14

Under Minnesota law, an employer shall pay wages or commissions "earned and unpaid at the time the employee quits or resigns." Minn. Stat. § 181.14, subd. 1. Such payment must occur "not later than the first regularly scheduled payday following the employee's final day of employment." *Id.* If wages or commissions are not paid within the statutorily required time, they "shall become immediately payable upon the demand of the employee." *Id.*, subd. 2. If payment is not made within 24 hours after the employee's demand, the employer is liable for a statutory penalty. *Id.* But in the event that an employer disputes the amount of wages or commissions claimed by the employee and makes a legal tender of the amount that the employer in good faith claims to be due, "the employer shall not be liable for any sum greater than the amount so tendered and interest thereon" unless "the employee recovers a greater sum" in a subsequent lawsuit. *Id.*, subd. 3. By operation of the statute, "the employer escapes liability for penalties only if the employee recovers less than the amount tendered by the employer." *Toyota-Lift of Minn., Inc. v. Am. Warehouse Sys., LLC*, 886 N.W.2d 208, 212 (Minn. 2016) (internal quotation marks omitted).

As addressed above, Auge did not earn most of the commissions he alleges that he is owed. As such, those allegedly unpaid commissions cannot support a claim under Section 181.14. *See Caldas*, 820 N.W.2d at 837 (stating that the Minnesota Payment of Wages Act "does not create a substantive right to the recovery of a particular wage"); *Lee*, 741 N.W.2d at 125 (explaining that the similar provisions in Section 181.13 reflect the legislature's intent to create "a timing statute, mandating not *what* an employer must pay a

discharged employee, but *when* an employer must pay a discharged employee"). The only commissions that Fairchild undisputedly owed Auge, but did not promptly pay him after his resignation, were the commissions for four of the miscellaneous transactions addressed above in Part I.C. But because Fairchild tendered the amount that it owed Auge for those commissions after he demanded payment, Fairchild cannot be liable under Section 181.14 for those payments, or for any penalty associated with them. *See* Minn. Stat. § 181.14, subd. 3. For this reason, Fairchild is entitled to summary judgment as to Auge's claim under Section 181.14.

### B.    Section 181.03

An employer "may not alter the method of payment, timing of payment, or procedures for payment of commissions earned through the last day of employment after the employee has resigned or been terminated if the result is to delay or reduce the amount of payment." Minn. Stat. § 181.03, subd. 2. The penalty for violating Section 181.03 is double the unpaid wages along with liability for attorneys' fees. *Id.*, subd. 3; Minn. Stat. § 181.171, subd. 3.

The undisputed record reflects that, after Auge resigned, Fairchild continued to use the same general method of paying Auge's commission (*i.e.*, direct deposit), the same timing of paying Auge's commission (*i.e.*, the second pay period of the month after the commission was earned), and the same procedures for paying Auge's commission (*i.e.*, Fairchild calculated the payment and deposited it in Auge's bank account). But Auge asserts that Fairchild altered the procedure of paying his commission when Fairchild reversed the July 24, 2017 direct deposit and issued a "Corrected Commission Statement"

the next day. The record reflects that Fairchild reversed the deposit to correct an administrative error. And, as addressed above, this correction did not reduce the amount that Fairchild properly owed. Auge also contends that the "Corrected Commission Statement" reflects an altered method of calculating Auge's commission payment by retroactively reducing the gross profit recognized on the JCB equipment sale to Birds Eye Foods. But, as addressed above, the "Corrected Commission Statement" is consistent with the 2017 Pay Program and with Fairchild's multiple communications to Auge, before he resigned, about the method by which his commission would be calculated and paid. Since any alteration to Fairchild's method of calculating Ague's commission occurred *before* Auge resigned, such alteration cannot establish a violation of Section 181.03. Fairchild is entitled to summary judgment as to Auge's claim under Section 181.03.

In summary, there is not a genuine dispute of material fact as to Auge's claims under the Minnesota Payment of Wages Act, and the record establishes that Fairchild is entitled to judgment as a matter of law as to these claims. For these reasons, Auge's motion for summary judgment as to Count II of the complaint is denied and Fairchild's motion for summary judgment as to Count II of the complaint is granted.

## ORDER

Based on the foregoing analysis and all the files, records and proceedings herein, **IT IS HEREBY ORDERED**:

1.     Plaintiff Todd D. Auge's motion for summary judgment, (Dkt. 40), is **DENIED**.

2.      Defendant Fairchild Equipment, Inc.'s motion for summary judgment, (Dkt. 46), is **GRANTED**.

LET JUDGMENT BE ENTERED ACCORDINGLY.


Dated:  June 24, 2019                                    s/Wilhelmina M. Wright
                                                        Wilhelmina M. Wright
                                                        United States District Judge